INTERNATIONAL HARVESTER CRED-
IT CORPORATION, Appellant
(Plaintiff Below),

v.

Robert PEFLEY and Pefley & Son,
Inc., Appellees (Defendants Below).

No. 2–681A192.

Court of Appeals of Indiana,
Second District.

Dec. 29, 1983.

R.P. Fisher, McCallen, Fisher & Ireland,
Wabash, for appellant.

Stephen H. Downs, Plummer, Tiede,
Magley, Metz & Downs, Wabash, for appel-
lees.

SULLIVAN, Judge.

International Harvester Credit Corpora-
tion (International Harvester) appeals a
negative judgment in a suit against defend-
ants, Robert Pefley and Pefley & Son, Inc.
(Pefley), of Lagro, Indiana, for conversion
of a new International Harvester tractor.
Pefley purchased the tractor in question
from one James Oliver who had two days
previously, unknown to Pefley, purchased
the tractor from Sanders Sales & Service,
Inc. (Sanders) of Urbana, Ohio, giving a
security interest in the tractor to Sanders
who subsequently assigned the security in-
terest to International Harvester. Oliver's
sale to Pefley was in breach of his security
agreement and he defaulted on his pay-
ments to International Harvester who
sought at trial to recover against Pefley.

The parties to this cause have framed
numerous issues for review. The lawsuit

here is subject to the provisions of the Uniform Commercial Code (hereinafter, UCC). U.C.C. § 9–306, Official Comment Number 3; *United States v. McCleskey Mills, Inc.*, (5th Cir.1969) 409 F.2d 1216. *See Bottema v. Producers Livestock Association* (1st Dist.1977) 174 Ind.App. 206, 366 N.E.2d 1189 at 1192. Therefore, after close consideration of each issue and in view of our disposition of this case, we regard the relevant issues to be:

(1) Whether International Harvester in fact held a perfected security interest in the collateral in Ohio, and if so,

(2) Whether a purchaser who buys property subject to a security interest within four months of its removal from the state in which the security interest is perfected should prevail over the secured party who fails to perfect in the new situs state within four months.[1]

On February 3, 1977, James Oliver (Oliver) of Champaign County, Ohio, purchased an International Harvester tractor, model 886, from Sanders Sales & Service, Inc., (Sanders) a farm implement dealer in Urbana, Ohio. Oliver and Charles Sanders, president of Sanders, had agreed earlier in the week to a sale price of $18,800 for the tractor, but Oliver completed the transaction on February 3rd with Gene Hodge, Sanders' sales manager, because Charles Sanders was out of town.[2] Hodge prepared an installment sales contract which contained a security agreement, financing terms, and a description of the collateral. He also prepared a financing statement and an invoice receipt. After Hodge explained the terms of the security agreement, the financing arrangements, and the

terms of the installment sales contract, Oliver signed each of the three documents. Hodge then initialed and dated the invoice receipt, received Oliver's downpayment of $6,500 and gave Oliver a key to the tractor. Oliver departed with the tractor and has not been seen by the parties to this cause since then. On February 4th, the day after the sale, Hodge, pursuant to the Uniform Commercial Code requirement, filed the financing statement in the county recorder's office of Champaign County, Ohio, the county of Oliver's residence. Charles Sanders returned from out of town on February 14th, and at that time signed and dated the installment sales contract-security agreement for the purpose of assigning the agreement to International Harvester.

The installment sales contract-security agreement signed by Oliver provided, in part, that International Harvester, Sanders' assignee, was to hold a purchase money security interest in the tractor for the unpaid balance of $12,303; equal payments of $4,257 were to be made annually on February 3rd of the subsequent four years; and Oliver, while subject to International Harvester's security interest in the tractor, was not to sell, assign, lease or remove the tractor from the state without the express approval of International Harvester.

On February 5th, two days after Oliver had purchased the tractor from Sanders for $18,800, giving a security interest in it, he sold it for $14,000 to Robert Pefley of Lagro, Indiana, a farm implement dealer who travels widely throughout the country buying and selling farm equipment at auctions. Oliver and Pefley met for the first

---

1. In addition to the issues stated above, the parties question (1) whether Pefley was a "buyer in the ordinary course of business" enabling him to defeat International Harvester's security interest; (2) whether Sanders impliedly authorized Oliver to sell the collateral thereby estopping International Harvester, Sanders' assignee, from asserting its security interest against Pefley; and (3) the propriety of a number of jury instructions.

2. The dealer's list price for this model was between $22,000 and $23,000 although the invoice cost was approximately $15,000. The fair mar-

ket value for the tractor in the spring of 1977 was estimated to be somewhere between $14,000 and $18,000. The record contains conflicting testimony as to how well new International Harvester models were selling in early 1977 at dealer prices. By arrangement with International Harvester, Sanders "floor planned" the Harvester tractors for display for certain lengths of time free of interest charges. The date upon which interest began to accrue on Sanders' floor planned model 886 was nearing when Oliver purchased the tractor from Sanders.

and only time at a farm implement auction in London, Ohio, on February 1st, two days before Oliver purchased the tractor in question from Sanders. Curiously, and unexplained in the record, Oliver had the tractor in his possession at this auction and put it through the "show ring" soliciting bids. Testimony reveals that the Sanders' sales personnel seemed quite puzzled by this occurrence. In any event, the tractor was back on Sanders' lot being prepped for sale on February 3rd. At the auction, before bids commenced, Oliver and Pefley discussed sale of the tractor but no agreement was reached. During the bidding, Pefley's bid of $14,000 was the highest but Oliver refused to accept it. Oliver called Pefley in Indiana the next day, still wanting to sell the tractor. They agreed, over the phone, to a price of $14,000, Pefley's bid of the previous day. Oliver made arrangements to have the tractor delivered to Pefley in Indiana on February 5th at which time Pefley paid the $14,000.

Pefley testified that he was unaware of Oliver's deal with Sanders and had no knowledge of a security interest in the tractor or that Oliver did not own the tractor when he showed it at the auction on February 1st. Pefley testified that he asked Oliver whether the tractor was subject to any liens or mortgages and was assured by Oliver that the tractor was "free and clear." Pefley did not conduct a record search in Ohio to make certain that the tractor was free of another's security interest. Pefley explained that it was not customary for those in the business of buying and selling farm equipment at auctions to conduct record searches for prior security interests, although he had done so on occasion. He also testified that it was presumed, among those in his business, that goods placed on consignment at farm auctions were not impaired by security interests, apparently because those who take goods on consignment at auctions are themselves liable for conversion if collateral subject to prior security interests is sold.

On February 7, two days after Pefley bought the tractor from Oliver, he sold it to Stilesville Auction in Stilesville, Indiana.

Later in February, Pefley was contacted by a Mr. Howard of the London Auction and informed that "there might be a problem on the model 886." Pefley was told that another smaller tractor which had been sold through the auction by Oliver was discovered to be stolen and that he should be alert to a similar problem with the 886. Upon learning this, Pefley contacted Stilesville and made arrangements to buy back the 886 at a price $200 more than Stilesville had paid for it. Pefley testified that he took this action because of his concern for his reputation as a merchant. After another month had passed and Pefley had heard nothing further regarding the 886, Pefley again sold the tractor, this time to a man in Pennsylvania.

International Harvester's representative testified that the company learned of the removal of the tractor from Ohio sometime within thirty days from the time Sanders had sold the tractor to Oliver. International Harvester did not file a financing statement in Indiana at any time. Legal proceedings on the matter were instituted in October of 1977, and International Harvester's representatives tried, unsuccessfully, to locate Oliver in the interim.

■ We are presented here with a negative verdict against the party having the burden of proof. On appeal we may look to the evidence solely for the purpose of determining whether there is uncontradicted evidence which leads to conclusions contrary to that of the jury. *Langford v. Anderson Banking Co.* (1970) 146 Ind.App. 677, 258 N.E.2d 60, 64. Where the facts are undisputed, and are such that reasonable men can draw but one conclusion therefrom, the question becomes one of law. *Lafayette Bank and Trust Co. v. Price* (1st Dist.1982) Ind.App., 440 N.E.2d 759, 763; *Baltimore and O.R. Co. v. Patrick* (1960) 131 Ind.App. 105, 166 N.E.2d 654.

International Harvester contends that it was entitled, as a matter of law, to a determination that it held a perfected security interest in the International Harvester tractor under Ohio law as of February 4, 1977.

Harvester further argues that the giving of an instruction to the jury directing it to ascertain whether Harvester's security interest had attached and was perfected was error because it had proven each and every formal requisite for attachment and perfection. Harvester believes the evidence was uncontradicted, thus creating a question of law rather than one of fact.

## I.

■ In determining whether a valid security interest has been created and perfected, the requirements of the Uniform Commercial Code (hereinafter referred to as the UCC) are controlling.

The UCC (1962 Official Text) has been adopted in Indiana and is codified in Title 26 of the Indiana Code. UCC § 9–103(3) provides, in pertinent part:

> "If personal property other than that governed by subsections (1) and (2) is already subject to a security interest when it is brought into this state, the validity of the security interest in this state is to be determined by the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached."

■ In this case, the collateral was in Ohio when the security interest allegedly attached. We will, therefore, look to Ohio law to consider the validity of the security interest. At the time this suit arose, Ohio law contained the 1962 provisions of the UCC's article on Secured Transactions under which Indiana still functions. Accordingly, we will hereinafter refer to the controlling provisions as they are stated in the 1962 text.

UCC § 9–204 provides that a security interest attaches when the parties agree that it attach, the creditor gives value, and the debtor acquires rights in the collateral. When each of these events has taken place, attachment occurs under the statute unless the time of attachment is postponed by explicit agreement. UCC § 9–203(1)(b) stipulates, however, that the security interest is not enforceable against the debtor or third parties unless the debtor has signed a written security agreement which contains an adequate description of the collateral. Taking these provisions together, an enforceable security agreement is created when (1) the parties agree that it attach, (2) the creditor gives value, (3) the debtor acquires rights in the collateral, (4) the debtor signs a written security agreement, and (5) the security agreement adequately describes the secured collateral. In order for the security agreement to become perfected and enforceable against third parties, UCC § 9–302 generally requires, with certain exceptions, the filing of a financing statement in the proper location and within the proper time. The financing statement, under UCC § 9–402, must contain the signatures and addresses of both parties and a description of the collateral. Where the collateral is equipment used in farming operations, as in this case, UCC § 9–401 requires that the financing statement be filed in the office of the county recorder in the county of the debtor's residence.

Pefley contends that the facts pertaining to attachment and perfection in this case are contradictory. We have carefully reviewed these facts and find them virtually undisputed. Oliver and Sanders' agent, Hodge, entered into a written security agreement on February 3rd. Sanders gave value (i.e. credit), Oliver acquired rights in the collateral (i.e. ownership and possession), the collateral was clearly described in the agreement, and Oliver signed the instrument. We find no statutory deficiency in creation of this security interest on February 3rd. Furthermore, there is no evidence to indicate the parties intended the attachment to occur at a later date. Since the Code refers to postponement of attachment by explicit agreement, we can only conclude that the parties intended to create a security interest attaching on February 3rd.

■ Pefley argues that because Charles Sanders did not sign and date the instrument until February 14th, the agreement was neither executed nor valid until that date by which time he had already pur-

chased and resold the tractor. Pefley views Charles Sanders' testimony explaining the February 14th date, which appears on the face of the installment sales contract—security agreement, as contradictory evidence as to the date of execution. Sanders explained at trial that he had been out of town when the transaction was completed between his sales manager and Oliver. While Hodge carefully completed every step required by the UCC for attachment and perfection, he did not sign or date the instrument on February 3rd. That the events transpired on February 3rd is uncontradicted. Sanders testified that he signed and dated the document in the blanks left by Hodge for the purpose of assigning the security interest and the installment contract to International Harvester as soon as he returned from out of town. We view these facts not as contradictory but as supplementary. Furthermore, the presumption that an instrument was made on the day of its date is not conclusive and may be overcome by parol evidence. *Ratcliff v. Dick Johnson School Tp.* (1933) 204 Ind. 525, 185 N.E. 143.

■ The true issue, in our view, does not involve a factual dispute. It is, rather, the resultant legal outcome arising from undisputed facts. It must be remembered that the dispute regards attachment of a security interest and is governed by the UCC. We are not considering date of execution of a contract per se. The UCC itself provides that it is to be liberally construed and applied to promote its underlying purposes and policies. *See* § 1–102. The courts may not create exceptions or add requirements to the clear dictates of the Code other than those specified. Therefore, we note that the content required of a security agreement is minimal in nature. An enforceable security interest must be created in a written agreement granting a security interest, the collateral must be described, and the debtor must sign the agreement. The Code does not require the date of the security agreement to appear therein, and a security agreement which contains neither the date nor the signature of the creditor is valid. If Charles Sanders had never signed

or dated the instrument, the outcome would not be affected. That he did sign and date the installment sales contract-security agreement on February 14th has no effect on the validity of the agreement or the date on which the security interest attached. We cannot subscribe to Pefley's theory nor do we believe it comports with the statutory requirements for creation of security interests under the UCC.

Although Pefley alleges the financing statement was not valid, we find no grounds upon which it can be successfully challenged. Neither its content nor the propriety of its filing are questioned by Pefley. His challenge to perfection of the security interest stems from his contentions regarding date of attachment and execution, a matter we have already resolved.

We hold, as a matter of law, that the formal requisites for the attachment and perfection of International Harvester's security interest in the tractor in Ohio on February 4, 1977, were met. Consequently, International Harvester was entitled to a favorable determination upon this issue at trial as a matter of law. The instruction allowing the jury to deliberate on that which was established as a matter of law was error.

## II.

■ We must next consider the enforceability in Indiana of International Harvester's perfected Ohio security interest. This requires the application of the multi-state transaction provisions of UCC § 9–103(3) to International Harvester's security interest. This section provides, in pertinent part:

> "If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, the security interest continues perfected in this state for four (4) months and also thereafter if within the four-month period it is perfected in this state. The security interest may also be perfected in this state after the expiration of the four-

month period; in such case perfection dates from the time of perfection in this state. If the security interest was not perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this state, it may be perfected in this state; in such case perfection dates from the time of perfection in this state." (Emphasis supplied.)

We have resolved that International Harvester, under Ohio law, held a perfected security interest in the tractor as of February 4, 1977. The tractor was removed from Ohio and sold to Pefley in Indiana on February 5, 1977. International Harvester did not file a financing statement in Indiana within the four month period, or at any time thereafter. The pivotal question then is whether a purchaser of secured collateral who buys within four months of the collateral's removal from the state in which the security interest is perfected should prevail over the secured party who fails to perfect in the removal state within four months. The statute clearly provides that those who purchase secured collateral *after* four months from the date of removal, where the secured party has failed to file in the removal state, take the collateral free of the secured party's interest. The ambiguity in the statute arises when the collateral is purchased *within* the four month period. It is indiscernable, from the statute alone, whether all purchases made during that four month period are subject to the secured party's interest, even though the secured party does not perfect in the removal state, or whether the original protection is lost if purchase takes place prior

to perfection which occurs in the new state within the four month period.

Upon this issue there has been a considerable split of authority among the jurisdictions and a diversity of opinion among commentators. There is no case law in Indiana. The question, therefore, is one of first impression.

At the outset, we think it helpful to review the history of this particular provision. The ambiguity present in the 1962 Official Text, currently the law in Indiana, has been eliminated in the 1972 Official Text under the revised § 9–103(1)(d)(i).[3] The 1972 revision plainly favors what has become known as the "conditional protection" view. Under the revision, a secured party is conditionally perfected for four months from the date of removal of the collateral, the condition being that he file in the removal state within the four months. If the secured party fails to file, his interest becomes unperfected and the purchaser who acquired an interest in the collateral within the four months takes priority. Our research discloses that the 1972 Official Text has been adopted in thirty-seven (37) states and the District of Columbia. *See* Uniform Laws Annotated, Master Edition, 1983 Supp. The rule or rationale of the 1972 revision, however, rarely finds acceptance or adoption in interpretation of the ambiguous portion of the 1962 text which binds us.

The majority view of the § 9–103(3) provision of the 1962 UCC was that the four month period was one of absolute protection.[4] Therefore, failure of the secured party to file in the removal state had no bearing on the status of the security interest as to those who acquired an interest in

---

**3.** The 1972 revision to UCC § 9–103 states, in subsection (1):

"(d) When collateral is brought into and kept in this state while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected, but if action is required by Part 3 of this Article to perfect the security interest,

(i) If the action is not taken before the expiration of the period of perfection in the other jurisdiction or the end of four months after the collateral is brought into this state,

whichever period first expires, the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal; ..."

**4.** For a complete list of states adopting and commentators favoring the majority "absolute protection" view of the 1962 UCC § 9–103(3), see *United States v. Burnette Carter*, (6th Cir., 1978), 575 F.2d 587, *cert. denied*, 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669.

the collateral within the four month period. Under this view, the secured party would forever have priority against those parties acquiring an interest within four months of removal.

The courts which, under the 1962 text, adopted the then majority rule generally construed the phrase "continues perfected" to mean absolute protection, hence priority, *American State Bank v. White* (1975) 217 Kan. 78, 535 P.2d 424; *Churchill Motors v. Lohman, Inc.* (1962) 16 A.D.2d 560, 229 N.Y.S.2d 570, although various reasons have been given for adopting the absolute rule. The Missouri Court of Appeals in *John Deere Co. v. Sanders* (Mo.App.1981), 617 S.W.2d 606, opted for the rule because it was consistent with the pre-code common law in the state. The court reasoned that if the legislature had intended for the statute to deviate from pre-code common law tradition, it would have so indicated by altering the language of the statute. The 6th Circuit Court of Appeals in *United States v. Burnette Carter* (6th Cir.1978) 575 F.2d 587, explained, in deciding which rule to apply where Farmers Home Administration loans were involved, that it felt duty-bound to formulate federal common law in a manner consistent with the majority of the states for purposes of uniformity. It did not debate the relative merits of the two rules or indicate its own preference. In choosing the absolute rule, it noted that at such time the majority of the states adopted the 1972 version of the UCC containing the conditional provision, it would hold differently in a similar case properly before the court. As stated previously, the 1978 *Burnette-Carter* majority rule has in fact become the minority rule among the states in 1983. In our view, the majority interpretation fails to adequately consider the intent of the drafters as reflected in Official Comment 7 to the provision. Official Comment 7 to UCC § 9–103 has been heavily relied upon by those few states which chose to adopt the minority "conditional protection" interpretation of the 1962 provision. We also find it helpful. It states:

" ... Subsection (3) proceeds on the theory that not only the secured party whose collateral has been removed but also creditors of and purchasers from the debtor in this state should be considered. The four month period is long enough for a secured party to discover in most cases that the collateral has been removed and to file in this state; thereafter, if he has not done so, his interest, although originally perfected in the state where it attached, is subject to defeat here by those persons who take priority over an unperfected security interest (see Section 9–301). Under Section 9–312(5) the holder of a perfected conflicting security interest is such a person even though during the four month period the conflicting interest was junior.

Compare the situation arising under Section 9–403(2) when a filing lapses.

In case of delay beyond the four month period, there is no "relation back"; and this is also true where, in this state, the security interest is perfected for the first time."

It would appear, from this comment, that the drafters were not inclined toward the view that the security holder's interest should continue perfected absolutely as to those having a conflicting interest arising within the four months and who "take priority over an unperfected security interest." While the language seems to refer to those who have conflicting security interests in the collateral and does not specifically refer to the status of other persons who acquire an interest in the collateral during the four months, the indication is that the four month period is less than a period of absolute perfection. Other commentators would agree. *See* Vernon, *Recorded Chattel Security Interests in the Conflict of Laws*, 47 Iowa L.Rev. 346, 377, 378 (1962); J. WHITE AND R. SUMMERS, UNIFORM COMMERCIAL CODE, 848–49 (1972).

We agree with the Arizona Court of Appeals:

"The UCC's establishment of a four-month period of protection was an at-

tempt to insure a definite cutoff period for the determination of rights and priorities of liens. Our holding effectively attains that goal. At the expiration of the four-month period, either the secured party has reperfected and has priority over subsequent interest holders or fails to reperfect and loses his priority. If we were to hold otherwise, years after the four-month period the original secured party would be able to maintain his lien against innocent purchasers ad infinitum if the collateral has been sold during the four-month period. Such a holding does nothing to effectively establish rights at the earliest possible time. We have used the UCC and the Official Comments to further the policy the Code has outlined." *Arrow Ford, Inc. v. Western Landscape Construction Co., Inc.,* (1975) 23 Ariz. App. 281, 532 P.2d 553, at 558.

In addressing the same problem, the court in *United States v. Squires,* (S.D. Iowa, 1974), 378 F.Supp. 798, 804, stated:

"The Court cannot reconcile how a buyer without notice of the security interest can be in a lesser position than the holder of a perfected conflicting security inter.est arising within the four-month period. At the end of the four month period, if the person with the senior security interest does not file in the new state to perfect that security interest, the buyer without notice of the security interest should take precedence over the security interest consistent with Comment 7 noted above." [5]

In accord with the views cited above, we believe the "conditional protection" interpretation of the ambiguous statute is the better rule and in conformity with the philosophy and intent of the drafters. We hereby adopt the rule in Indiana.

The conditional protection rule, in this case, operates to render International Harvester's security interest unperfected in Indiana. Harvester makes no argument that its security interest, even if unperfected, has priority over Pefley's interest. However, we note that an unperfected security interest might take priority if the purchaser is not a purchaser for value without knowledge of the prior security interest.[6] Therefore, to the extent that International Harvester has argued the knowledge element, albeit in the context of Pefley's affirmative defense of "buyer in the ordinary course" which we do not here consider, we think it appropriate to give some attention to the argument as it pertains to the issue of knowledge under UCC § 9–301(1).

Under this provision, International Harvester might yet take priority over Pefley if the evidence revealed, as a matter of law, that Pefley did not give value or that Pefley knew of International Harvester's prior security interest. International Harvester urges that knowledge should be imputed to Pefley who, as a merchant, should have known to check for a security interest, and had he done so, would have discovered International Harvester's lien. In support of this contention, International Harvester cites us to *Swift v. J.I. Case Co.* (Fla.Dist. Ct.App., 1972), 266 So.2d 379, which like the immediate case, involves sale of an encumbered tractor to a tractor dealer without knowledge of the prior security interest. There, the court applied the merchant good faith standard to determine whether the purchaser had a duty to make a record inquiry as to the existence of a

**5.** In this regard, one may note that the absolute protection construction works a blatant inequity in the case of an innocent purchaser who by misfortune happens to purchase the collateral three months and thirty days after removal. Had the unknowing purchaser waited one more day to buy, he would take priority over the secured party. His unwitting purchase at the wrong time, however, permanently subordinates him to the security holder.

**6.** UCC § 9–301(1) provides in part: "Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of . . .

(c) in the case of goods, instruments, documents, and chattel paper, a person who is not a secured party and who is a transferee in bulk, or other buyer not in the ordinary course of business . . . to the extent that the gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected . . ."

security interest in the collateral. The court held:

> "A commercially prudent tractor merchant could not in 'good faith,' and in compliance with commercial practices of his trade, purchase a tractor from another dealer without first making a record inquiry into the existence of a previously perfected security interest." 266 So.2d at 381.

The *Swift* case is distinguishable in several respects. The question of good faith and knowledge arose in that case in regard to the purchaser's status as a "buyer in the ordinary course of business." The good faith aspect of "buyer in the ordinary course" status inextricably involves the purchaser's knowledge. The *Swift* case, in effect, imputed knowledge to the purchaser because, had he checked, he would have discovered the security interest. On this ground the court refused to acknowledge good faith.

We are not considering good faith as it pertains to a "buyer in the ordinary course." Our inquiry at this juncture concerns priority between parties with conflicting interests. Good faith is not an element considered in determining priorities. Knowledge of a prior security interest, however, is an element under this statute. Our review of cases in which § 9–301(1)(c) "knowledge" is at issue reveals that actual rather than constructive knowledge is required to defeat the purchaser. *In re Dennis Mitchell Industries, Inc.,* (3rd Cir., 1969) 419 F.2d 349; *Hopkins v. Kemp Motor Sales, Inc.,* (1976) 139 Ga.App. 471, 288 S.E.2d 607. *Levine v. Pascal v. Palos State Bank,* (1968) 94 Ill.App.2d 43, 236 N.E.2d 425. International Harvester concedes that Pefley had no actual knowledge of its security interest. Consequently, Pefley, as a purchaser for value without knowledge takes priority over International Harvester's unperfected security interest.

In conclusion, International Harvester held a perfected security interest in the model 886 tractor in Ohio. The security interest was rendered unperfected in Indiana by operation of law for failure to file in this state within four months of the collateral's removal. International Harvester's unperfected security interest was then subordinated to Pefley, a purchaser for value and without knowledge of the security interest.

The judgment of the trial court is affirmed.

BUCHANAN, C.J., and SHIELDS, J., concur.