In re PROTEVA, INC. and Proteva Marketing Group, Inc., Debtors.

Liquidating Grantor's Trust of Proteva, Inc. and Proteva Marketing Group, Inc., Plaintiff,

v.

Finova Capital Corporation, William Lynch, Brian Jordan and John Roberts, Defendants.

Bankruptcy Nos. 99 B 26880, 99 B 26884. Adversary No. 01 A 00022.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

May 31, 2002.

Frances F. Gecker, Freeborn & Peters, Chicago, IL, for Plaintiff.

J. Douglas Bacon, Latham & Watkins, Catherine A. Van Horn, Mandell, Menkes & Surdyk, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This cause comes to be heard on the motion of Finova Capital Corporation ("Finova"), one of the defendants herein, to dismiss and/or for entry of summary judgment with respect to Counts I through IV and VI of the Complaint. For the reasons stated herein, the motion is denied.

### I.

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). Venue is proper pursuant to 28 U.S.C. § 1409(a).

### II.

### BACKGROUND

#### A. Procedural Background

On August 30, 1999 (the "Petition Date"), Proteva, Inc. ("Proteva") and Proteva Marketing Group ("PMG") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") commencing this chapter 11 case (the "Chapter 11 Case"). Proteva and PMG are sometimes collectively referred to as the "Debtors." On September 13, 1999, an official committee of unsecured creditors (the "Committee") was appointed

pursuant to section 1102 of the Bankruptcy Code.

On February 15, 2000 (the "Confirmation Date"), this Court entered an order confirming the Committee's Amended Liquidating Plan of Reorganization dated January 11, 2000 (the "Plan"). Under the Plan and Confirmation Order, the estates of the separate Debtors were substantively consolidated pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and their assets were transferred to the Liquidating Grantor's Trust (the "Trust"), which was established pursuant to the Plan. The Plan and Confirmation Order authorized the Trust to *inter alia* administer the Debtors' assets from the Confirmation Date, distribute estate funds to creditors with allowed claims, and prosecute claims and causes of actions belonging to the estates.

Prior to the Petition Date, the Debtors produced build-to-order computers for retail sale throughout the United States. Proteva operated from facilities in Illinois and Wisconsin. PMG's facility was located in Marietta, Georgia. Finova, a Delaware corporation with offices located in King of Prussia, Pennsylvania, provided financing to the Debtors. The obligations of the Debtors to Finova were guaranteed by three shareholders and officers of the Debtors, William Lynch, Brian Jordan and John Roberts (collectively, the "Guarantors").

On January 3, 2001, the Trust filed a seven-count complaint against Finova and the Guarantors (the "Complaint") which commenced this adversary proceeding. Counts I through IV and VI seek relief against Finova and Counts V and VII seek relief against the Guarantors.[1]

As for the counts against Finova which are the subject of this opinion, the Trust seeks to:

(i) avoid the grant of a security interest to Finova as a preferential transfer under section 547 of the Bankruptcy Code (Count I);

(ii) recover payments totaling $11,083,671.85 made by the Debtors to Finova in the 90–days preceding the Petition Date (the "Preference Period") as preferential transfers under sections 547 and 550 of the Bankruptcy Code (Count II);

(iii) avoid the lien held by Finova in the Debtors' assets as a fraudulent transfer under section 548 of the Bankruptcy Code (Count III);

(iv) recover a total of $2,263,833.30 of postpetition transfers made by the Debtors to Finova (the "Postpetition Transfers") pursuant to section 549 of the Bankruptcy Code, or, in the alternative recover a total of $1,033,330.43 of the Postpetition Transfers pursuant to Section 9–306(4)(2) of the Uniform Commercial Code (Count IV); and

(v) equitably subordinate Finova's claims to the claims of all other creditors pursuant to section 510(c) of the Bankruptcy Code (Count VI).

On February 2, 2001, Finova filed a motion to dismiss counts I through IV and VI of the Complaint under Fed.R.Civ.P. 12(b)(6) made applicable herein by Bankruptcy Rule 7012(b) and/or for entry of summary judgment under Fed.R.Civ.P. 56 made applicable herein by Bankruptcy Rule 7056. Local Bankruptcy Rule 403 governs summary judgment practice in this Court and requires the movant to file with its summary judgment motion a Statement of Undisputed Material Facts setting forth in separate paragraphs the

---

**1.** Count VII of the Complaint is misnumbered as a second Count VI.

facts that movant believes demonstrate the lack of a genuine issue of material fact (the "Rule 403(M) Statement"). The nonmovant must file a response to the Rule 403(M) Statement admitting or denying each fact. The nonmovant can also file its own statement of facts that it believes precludes summary judgment (the "Rule 403(N) Statement").

Finova filed its Rule 403(M) Statement with the Affidavit of John Sawn, a Vice-President of Finova ("Sawn") and copies of various documents and court orders. The Trust filed a response to the motion and a response to Finova's Rule 403(M) Statement. The Trust also filed its Rule 403(N) Statement setting forth additional facts that Finova believes raise genuine issues of material fact that preclude the entry of summary judgment. Finova filed a reply with respect to the motion and a reply to the Rule 403(N) Statement. The Court thereafter took the motion under advisement.

## B. *The Finova Security Interest*

Unless otherwise noted, the following facts are undisputed. On August 3, 1995, Finova entered into an agreement entitled "Dealer Loan and Security Agreement" (the "08/95 Security Agreement") with Fountain Marketing Group, Inc. ("Fountain") whereby Finova agreed to make loans to Fountain in exchange for two types of security interests. First, Fountain granted Finova a purchase money se-

curity interest in "... Inventory, the Proceeds thereof and all General Intangibles related thereto." The purchase money security interest covered only the loans used by Finova to acquire rights in the Inventory. Fountain also granted Finova a security interest "to secure repayment ... of all debts and liabilities ... under this Agreement or any other agreement" in Inventory, Accounts and General Intangibles and the Proceeds of the same.

Finova filed a UCC–1 financing statement[2] on August 10, 1995 with the Office of the Secretary of State of Illinois to perfect its security interest in the Collateral (the "First UCC–1 Financing Statement"). Finova and Fountain are listed on the First UCC–1 Financing Statement as "secured party" and "debtor", respectively. The collateral description in the First UCC–1 Financing Statement included some items, such as fixtures, equipment, chattel paper and contract rights that were not described in the 08/95 Security Agreement as being part of the collateral subject to the security interest. No one has raised the issue of the effect of this discrepancy.

Finova made loans to Fountain, pursuant to the 08/95 Security Agreement, on an ongoing basis beginning in 1995. In his Affidavit, Sawn indicated that loans were made by Finova not only to Fountain but to Proteva, which Finova argues is in fact Fountain under a new name.[3] Since this

---

**2.** In order for a secured creditor to perfect certain types of security interests, such as the interests here, it must file a financing statement in the appropriate governmental office in accordance with the applicable provisions of the Uniform Commercial Code ("UCC"). The financing statement is commonly known as a UCC–1 financing statement and identifies the names and addresses of the secured party and debtor and the collateral that is subject to the interest. *See generally*, Barkley Clark, THE LAW OF SECURED TRANSACTIONS

UNDER THE UNIFORM COMMERCIAL CODE chapter 2 (rev. ed.2001). A UCC–3 financing statement is completed and filed to indicate changes to the original UCC–1 financing statement, such as changes in the debtor's name or address, termination of the UCC–1 financing statement, etc. *Id.*

**3.** On April 2, 1997, Fountain filed Articles of Amendment with the Office of the Secretary of State of Illinois indicating that Fountain's Articles of Incorporation were amended to

statement about loans to Proteva from Sawn's Affidavit was not included in Finova's Rule 403(M) Statement, the Trust did not admit or deny whether Finova made loans to Fountain when its name became Proteva.

Early in 1997, Fountain moved from South Holland, Illinois to an address in Posen, Illinois. On February 5, 1997, Finova and Fountain entered into another Dealer Loan and Security Agreement, with identical provisions, but reflecting the new address of Fountain on the first page.

On February 20, 1997, a UCC–3 financing statement amending the First UCC–1 Financing Statement to reflect Fountain's new address was filed with the Office of the Secretary of State of Illinois. The UCC–3 statement was signed by Fountain. In addition, a UCC–1 financing statement, which except for the new address, contained the same information as the First UCC–1 Financing Statement, was filed on February 20, 1997 (the "Second UCC–1 Financing Statement"). Finova and Fountain were identified as "secured party" and "debtor," respectively on the Second UCC–1 Financing Statement.

The Trust contends that despite the filing of the Articles of Amendment, Fountain did not cease to operate as an entity separate from Proteva. Rather, the Trust alleges that Fountain remained in existence separate from Proteva from the filing of the Articles of Amendment to the Petition Date. In support of this contention, the Trust submits Proteva's Statement of Financial Affairs filed in the Chapter 11 Case, which lists a number of checks being sent by PMG to Fountain at the Posen address and to Proteva at the Wisconsin address in the Preference Period. Notably, the Statement of Financial Af-

fairs is the only evidence submitted by Finova with respect to the factual issue of whether Proteva is a successor of Fountain or a distinct corporate entity.

On July 16, 1997, a Dealer Loan and Security Agreement was entered into between Finova and Proteva (the "07/97 Security Agreement"). On the first page of the 07/97 Security Agreement, Proteva's name at the same Posen, Illinois address was listed opposite Finova's name and address. Otherwise, the agreement was identical to the prior two agreements. On that date, Finova also entered into an identical but separate Dealer Loan and Security Agreement with PMG (the "PMG Security Agreement"). PMG's address was listed as being in Alpharetta, Georgia. On October 22, 1997, a UCC–1 financing statement signed by Finova and PMG was filed with the Office of the Secretary of State of Georgia identifying PMG as the debtor. This financing statement listed Finova as secured party.

On November 26, 1997, two UCC–3 financing statements both signed by Finova and Proteva were filed with the Office of the Secretary of State of Illinois, amending the debtor's name on the First UCC–1 Financing Statement and the Second UCC–1 Financing Statement from Fountain to Proteva. Finova did not include in its materials any UCC–1 financing statements filed in Illinois identifying Proteva as the debtor.

Finally, on July 9, 1998, a UCC–1 financing statement signed by Proteva and Finova was filed in the State of Wisconsin (the "Wisconsin Financing Statement"). The Wisconsin Financing Statement reflects Proteva as the debtor at an address located in Iron Ridge, Wisconsin. So,

---

provide for, among other changes, a change of the corporation's name from Fountain to Proteva, Inc. The Office of the Secretary of State of Illinois issued a certificate of the amendment to the Articles of Incorporation on April 2, 1997.

based on the materials presently before the Court, the only filed UCC–1 financing statement in Proteva's name is the Wisconsin Financing Statement.

### C. *Pertinent Provisions of the Security Agreements*

All of the security agreements are identical, with the exception of the debtor's name and/or address. The agreements are written in the form of a letter from the debtor to the secured party, e.g. "Gentlemen: We are an authorized dealer of goods ... We may, ... from time to time obtain loans from you in order to finance the purchase of certain of such goods...."

The following effectiveness clause is in the penultimate paragraph of each agreement:

22. THIS AGREEMENT SHALL BE DEEMED EFFECTIVE WHEN ACCEPTED AND EXECUTED BY YOU [Finova] IN THE COMMONWEALTH OF PENNSYLVANIA, AND THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA.

Directly below this clause is a signature block for the debtor and the following signature block for Finova:

APPROVED AND ACCEPTED IN KING OF PRUSSIA, PENNSYLVANIA
FINOVA CAPITAL CORPORATION
(Secured Party)
By:
Date:

All of the agreements were signed by either Fountain, Proteva or PMG. The 07/97 Security Agreement was not signed by Finova. The Trust contends that Finova signed the 07/97 Security Agreement during the Preference Period. Finova disputes that it ever signed the 07/97 Security Agreement.

All of the agreements contain the following clause which the parties refer to as a "merger clause:"

In connection with each loan requested, we will deliver to you such other rights as you shall require, which may include notes or other appropriate evidence of debt. Such notes or other evidence of debt, Manufacturer invoices, and other like materials as may be revised from time to time ("Collateral Documents"), together with this Agreement, contain our entire understanding, and we acknowledge that we will not be relying upon any prior oral or written promises or undertakings or future oral promises between us.

All of the agreements contain the following "authorization clause":

We authorize and empower you or your employees, agents or representatives, on our behalf, and in our name, to complete and supply any omission or blank spaces in this agreement and in any documents or financing statements executed by us and including amendments and continuations thereof under the [the Uniform Commercial Code]; to execute and/or have acknowledged any form of security instruments, notes, drafts and documents; and to make any requisite affidavits which may be necessary or required by you, and/or which you may desire to evidence or secure advances made by you pursuant to the terms of this Agreement. All of the foregoing may be executed in such form and substance as you in your sole discretion may deem necessary or proper, and this power of at-

torney, being coupled with an interest, is irrevocable.

Finally, all of the agreements contain a provision providing that all of the secured debtor's obligations under the agreements bind its successors and assigns:

This Agreement may be assigned by you, but we may not assign this Agreement without your prior written consent. If you assign this Agreement, you shall have no further obligations hereunder. All of your rights hereunder shall inure to the benefit of your successors and assigns and all our obligation shall bind our successors and assigns. If there be more than one party obligated to you under this Agreement, their obligations hereunder shall be joint and several, and the terms "we" "us" or "our" as used herein shall refer to them jointly and severally.

#### D. *Arguments of the Parties*

The Trust contends that there are material issues of fact with respect to whether the "merger clause" operated to supercede the prior security agreement as each successive agreement was signed. If the "merger clause" had that effect, then the last agreement, the 07/97 Security Agreement, is the operative agreement as to Proteva. Moreover, because the 07/97 Security Agreement and the PMG Security Agreement, which conditioned the effectiveness of the agreements on Finova's signature and acceptance, were not signed by Finova until during the Preference Period, the Trust argues that Finova's security interest in Proteva and PMG's collateral attached during the Preference Period. Consequently, the granting of the security interest and the payments received in the Preference Period are avoidable preferences or fraudulent transfers.

Finova contends that the "merger clause" did not work to supercede the pri-

or agreements. As such, Finova's security interest arose from the 08/95 Security Agreement and attached in advance of the Preference Period, which would shield it from avoidance as a preference, and prior to one year before the Petition Date (the "Fraudulent Transfer Period"), which would shield it from a fraudulent transfer attack.

Finova argues that it makes no difference to the validity of its security interest if and when Finova signed the 07/97 Security Agreement (even if the 07/97 Security Agreement is the operative agreement) and the PMG Security Agreement. Finova contends that attachment occurred when Proteva signed the 07/97 Security Agreement and the PMG Security Agreement and the absence of or timing of Finova's signature makes no difference to the validity of the security interest.

#### E. *The Postpetition Transfers to Finova*

After the Petition Date, on September 2, 1999, the Court entered an order entitled "Interim Order Pursuant to 11 U.S.C. § 364(c) and Bankruptcy Rule 4001, Authorizing the Debtors to Obtain and Incur Post–Petition Financing and Post–Petition Indebtedness with Superpriority over Certain Administrative Expenses" (the "Interim Order"). The Interim Order authorized the Debtors to obtain postpetition financing from BTSA, Inc. and incur postpetition indebtedness related thereto. BTSA was granted, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority claim, secured in accordance with section 364(c)(2) of the Bankruptcy Code, by first priority liens on and security interest in all of the Debtor's assets, "subject only to the Finova Liens." Finova Liens are defined in Exhibit A to the Interim Order as the liens and security interests in favor of Finova. Exhibit A

contains the language that Finova "... asserts a valid and perfected lien on a security interest in all of the Debtor's inventory, accounts receivable, general intangibles, and the proceeds of each ('FINOVA Collateral')."

In addition, the Interim Order provides *inter alia:*

32. By September 2, 1999, the Debtors shall provide FINOVA with a detailed accounts receivable aging, together with a list of all accounts receivable that were outstanding as of the Petition Date ... together with a detailed listing of all inventory owned by Debtors as of the Petition Date.

33. Any cash or cash equivalents received by either of the Debtors on or after the Petition Date that constitute proceeds of the FINOVA Collateral, shall be segregated upon receipt by the Debtors, accounted for, and promptly delivered to FINOVA for application to the FINOVA Claim. Nothing in this Order authorizes the Debtors to expend any cash collateral that consists of proceeds of the FINOVA Collateral.

34. By Tuesday of each week, beginning September 7, 1999, the Debtors shall provide FINOVA and its counsel with detailed written reports clearly identifying the sources of all cash proceeds received by the Debtor on a cumulative basis since the Petition Date through the preceding Friday, and identifying any FINOVA Collateral that has been collected or sold.

35. FINOVA is authorized to apply any payments received by FINOVA to the FINOVA Claim, subject to the rights of the Debtors or any party in interest to challenge the FINO-VA Claim, or the liens and security interests claimed by FINOVA, and, if appropriate, to seek disgorgement of any postpetition payments made to FINOVA.

The Court thereafter entered a series of orders authorizing the Debtors to increase the amount of the interim financing on the same terms and conditions set forth in the Interim Order.

On September 14, 1999, the Court entered an order granting the Debtors' emergency motion for authority to make payments to Finova (the "Finova Payment Order"). The Finova Payment Order provided *inter alia:*

IT IS HEREBY ORDERED THAT Debtors are authorized to pay the sum of $497,080.07 to Finova Capital Corporation ("Finova") forthwith, without prejudice to the right of any party in interest to challenge the application of such payment if Finova's claim is ultimately determined to be undersecured.

IT IS FURTHER ORDERED that Debtors are authorized to continue to make payments to Finova from the proceeds of Finova's collateral until Finova's debt is fully paid, without prejudice to the right of any party in interest to challenge the application of such proceeds in the event that Finova's claim is ultimately determined to be undersecured.

In the 30 days after the Petition Date the Debtors paid Finova a total of $2,263,833.30.

### III.

### *DISCUSSION*

Finova brings its motion under Bankruptcy Rules 7012(b)(6) and 7056. If a motion under Rule 7012(b)(6) is supported

by matters outside the pleadings, the Court must treat the motion as one under Bankruptcy Rule 7056. Since Finova filed the Sawn Affidavit, which included and incorporated documentary exhibits, the Court will treat the entire motion as a request for entry of summary judgment.

## A. *Standards for Summary Judgment*

The well-established standard on a motion under Fed.R.Civ.P. 56(c) and Bankruptcy Rule 7056 is that summary judgment is to be granted "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *E.g., Bellaver v. Quanex Corp.,* 200 F.3d 485, 491 (7th Cir.2000); *Feldman v. American Memorial Life Ins. Co.,* 196 F.3d 783, 789 (7th Cir.1999). In ruling on the motion, the court reviews the record in the light most favorable to the nonmoving party and it draws all reasonable inferences therefrom in the nonmovant's favor. *Schneiker v. Fortis Ins. Co.,* 200 F.3d 1055, 1057 (7th Cir.2000); *Filipovic v. K & R Express Systems, Inc.,* 176 F.3d 390, 395 (7th Cir. 1999).

The task on a motion for summary judgment is to determine whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied,* 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997); *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.,* 91 F.3d 1002, 1007 (7th Cir.1996). On such a motion, it is not the court's function to resolve factual disputes or to weigh conflicting evidence. *Id.* Summary judgment is appropriate when there is only one logi-cal conclusion that the fact finder can reach. *Marozsan v. United States,* 90 F.3d 1284, 1290 (7th Cir.1996), *cert. denied,* 520 U.S. 1109, 117 S.Ct. 1117, 137 L.Ed.2d 317 (1997).

The nonmovant must do more than demonstrate a factual disagreement between the parties; the factual issue must be "material". *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir.1996). "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Id.* (citation omitted). Issues of fact are "material" and preclude summary judgment if they raise "... disputes that could affect the outcome of the suit under governing law...." *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Factual disputes are "genuine" only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. Factual disputes that are colorable, not significantly probative, or speculative are *not* genuine. *Id.* at 249–50, 106 S.Ct. 2505.

"Hearsay is inadmissable in summary judgment proceedings to the same extent that is inadmissible in trial, except that affidavits and depositions which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, Fed.R.Civ.P. 56(c), (e), provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live." *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). Mere conclusory assertions are not sufficient to defeat a properly supported motion for summary judgment. *First Commodity Traders Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985).

**B.** *Summary Judgment on the Preference, Fraudulent Transfer and Equitable Subordination Counts*

**(i)** *General Considerations*

Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547.

Section 548(a)(1) provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition if the debtor voluntarily or involuntarily—

(A) made such transfer of incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1).

The actions to recover a preference and to recover a fraudulent transfer share the common element of a transfer of an interest of the debtor in property. What constitutes a "transfer" is a matter of federal law. *Barnhill v. Johnson*, 503 U.S. 393, 397–98, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).

Under the Bankruptcy Code, a transfer is made at the time the transfer takes effect, if such transfer is perfected at, or within 10 days after such time or at the time the transfer is perfected, if the transfer is perfected after the 10 days. 11 U.S.C. § 547(e)(2). A transfer is perfected when a "creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1).

A security interest has to attach to the debtor's property in order to be perfected. It is immaterial, however, whether attachment or perfection occurs first. *In re Southwest Pennsylvania Natural Resources, Inc.,* 11 B.R. 900, 901 (Bankr. W.D.Pa.1981). "Attachment ... is unique to the secured transaction because it refers to the notion that the creditor's interest in personal property clamps down on specified personal property as soon as the requisites set forth in section 9–203 (of the UCC) are complied with. The concept of attachment may thus be thought of as a giant hand of a secured creditor hovering in the universe; as soon as the requirements set forth in section 9–203 are met, the giant hand, the security interest, clamps down upon the property agreed to between the parties, and thereafter, at least to some extent, the property is subject to the security interest." 8 William D. Hawkland, HAWKLAND UNIFORM COMMERCIAL CODE SERIES § 9–203:3 (2001).

In this matter, the dispute centers around when the attachment occurred. The Trust argues that attachment, if it occurred, took place in the 90–days preceding the Petition Date. Finova argues that there is no genuine issue of material fact that the attachment occurred outside of the Preference Period and the Fraudulent Transfer Period.

As for the equitable subordination count, of which there is little discussion in the motion, the Trust alleges that the claims of Finova should be subordinated, because when Finova brought a motion in the Chapter 11 Case to be paid on account of its secured claim, it knew or should have known that its security interest was not perfected. In addition, Finova's failure to disclose to the Court that it executed the 07/97 Security Agreement and PMG Security Agreement one month prior to the Petition Date is inequitable conduct to the detriment of the Debtors' other creditors. There is therefore an argument that if the Court finds that Finova's security interest is valid, then the basis of the equitable subordination count as it is presently plead now would necessarily fail.

**(ii)** *Has Finova established as a matter of law that its security interest attached prior to the Preference Period and the Fraudulent Transfer Period?*

**(a)** *The effect of the "Merger Clause" on the timing of the attachment.*

The Trust argues that the "merger clauses" in the agreements unambiguously demonstrate that each security agreement superceded the former security agreement, therefore the last agreement, the 07/97 Security Agreement, is the operative one as it relates to Proteva. In a sense, the Trust is arguing that as each agreement was signed, the security interest arising under the prior agreement was superceded. Moreover, because Finova signed the 07/97 Security Agreement and the PMG Security Agreement in the Preference Period the security interest attached in the Preference Period and the lien should be avoided. Finova argues that the merger clause unambiguously demonstrates that only the secured debtor was bound by the merger clause because the word "our" in the clause is limited to the secured debtor and the prior agreements survived.

Words used in a contract can be construed according to their ordinary, natural and commonly accepted meaning, unless the parties clearly intended a peculiar meaning. *First Commodity,* 766 F.2d at 1014. Ordinarily the words "our," "us" and "we" in a contract between two parties refer collectively to the two parties to the contract.

Here, however, the agreements are written as letters, so the words "we," "our," and "us" appear to refer only to the debtor, its successors and assigns. In fact, as noted above, a clause in the agreements states that "our," "us" and "we" refer to the secured debtor and its successors and assigns, as used therein. On the other hand, the merger clause contains a statement that "we" will not be relying upon any prior oral or written promises or undertakings or future oral promises **between us**. The words "between us" could be read to refer to the secured debtor and Finova. This creates an ambiguity that needs to be resolved.

Moreover, there is an ambiguity in the merger clause when it is examined in light of other provisions in the security agreements. *See Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir.2002)(Contract must be interpreted as a whole. "Sentences are not isolated units of meaning, but take meaning from other sentences in the same document."). As stated above, all of the security agreements provide that all of the obligations under the security agreement **or any other agreement** are subject to the security interest and bind successors and assigns. The question then is what did the parties really intend. Was the signing of each new security agreement a re-documentation of the security interest as changes to the name and address of the debtor occurred, or did the parties intend to create entirely new security interests? Again, this is a factual question that needs to be resolved.

If it turns out that the prior agreements were not superseded and provided Proteva and Fountain are the same entity, there really was no need for a new security agreement when Fountain changed its name to Proteva. *See In re Serrins Automotive Warehouse, Inc.*, 18 B.R. 718, 719 (Bankr.W.D.Pa.1980). On the other hand, if the 07/97 Security Agreement did supersede the prior agreement then the effect of the lack or timing of Finova's signature is an issue. The signature issue is also germane to the validity of the security interest with respect to PMG. A discussion of this issue follows.

**(b)** *Effect of the Lack of or Timing of Finova's Signature on the 07/97 Security Agreement and the PMG Security Agreement*

■ The parties agree that Pennsylvania law governs. Under Pennsylvania law in effect at the relevant time, attachment of a security interest occurs when collateral is in possession of the secured creditor, or the debtor signs a security agreement which contains a description of the collateral, value has been given and the debtor has rights in the collateral. 13 PA. CONST. STAT. § 9203(a) and (b) (1997). A security agreement is defined as "an agreement that creates or provides for a security interest." 13 PA. CONST. STAT. 9102 (1997).

■ The date of attachment can be postponed, but the agreement to postpone the timing of the attachment must be explicit. 13 PA. CONST. STAT. 9204 (1997). Postponement of attachment cannot be inferred from words or conduct. *In re Dolly Madison Industries, Inc.*, 351 F.Supp. 1038, 1041 (E.D.Pa.1972), *aff'd* 480 F.2d 917 (3d Cir.1973); *Appeal of Copeland*, 531 F.2d 1195, 1207 (3d Cir.1976); *Allegaert v. Chemical Bank*, 657 F.2d 495, 503–04 (2d Cir.1980).

■ The steps to obtain proper attachment are relatively easy by design. Nevertheless, there are from time to time problems with attachments. In this proceeding, the security agreement had a provision purportedly conditioning effectiveness of the security agreement on the

execution and acceptance of the secured lender. The parties are in litigation today, in part, because the lender's signature is missing on one of the security agreements.

This scenario is remarkably similar to the facts in *In re Vic Supply Co., Inc.*, 227 F.3d 928 (7th Cir.2000). The dispositive issue in *Vic Supply* was whether under Illinois' version of the UCC, one secured party had standing to attack the validity of a competing secured party's security interest. The security agreement in *Vic Supply* conditioned its effectiveness of the agreement on the signature of the secured party—"the terms and provision of this agreement shall not become effective and Bank shall have no duties hereunder unless and until this agreement is accepted by Bank as provided below." Directly below the quoted language was a blank for a signature that was not signed by the bank. Based on this conjunction of the effectiveness clause and the signature block, the Seventh Circuit equated acceptance by the bank with the bank's signature. In this matter, the 07/97 Security Agreement and the PMG Security Agreement provided essentially the same—effectiveness conditioned upon execution and acceptance followed by a signature block saying "accepted and approved."

The Seventh Circuit held that the competing secured party did not have standing to attack the effectiveness of the other secured party's security interest. The Court proceeded to examine the validity of the security interest. The Court found that the security agreement was effective for three reasons. First, the UCC provides that only the debtor has to sign a security agreement and the signature and other statutory requirements of attachment were met. Second, the Court reasoned that because the bank had authority to fill in any blanks, including the signa-

ture blank, at any time, that the requirement for the bank's signature was solely for the bank's protection. Finally, the Court found that even though the agreement equated acceptance with signature, the bank could also accept by performance. In this regard, performance was demonstrated because the bank lent money to the debtor against its inventory and both parties assumed this credit was extended on account of the agreement. In short, the parties behaved in a way that showed a binding contract.

Another case decided by the Supreme Court of Michigan had similar facts and results as *Vic Supply*. In *NBD–Sandusky Bank v. Ritter*, 437 Mich. 354, 471 N.W.2d 340 (1991), John Deere Company ("John Deere") held a purchase money security interest in the debtor's equipment. The financing agreement between the parties specified that "if this Loan Contract is accepted by Lender" the debtor promised to pay the amount loaned and grant a security interest in the equipment. The agreement had a signature clause prefaced with the words "accepted by" and contained a space for an authorized signature and date. Before the agreement was signed by John Deere, a financing statement was filed covering the subject equipment. In a subsequent priority dispute, the trial court held that because John Deere did not accept the agreement until it signed the agreement that it lost its perfected status in the equipment. The decision was affirmed by the court of appeals that held that an agreement was not reached until the agreement was signed.

The Supreme Court of Michigan reversed, noting—

> First, we underscore that the loan contract and security agreement document does not specify a method of acceptance, i.e., that it may only be accepted by John Deere's signature

on the document. Second, we find convincing the uncontroverted testimony presented at trial which established that it is John Deere's practice to accept a security agreement prior to the date that financing statement is filed. John Deere filed its financing statement on August 7, 1985. Thus, we conclude that John Deere both "accepted" the loan contract and security agreement and satisfied the "agreement" element of attachment as of August 7, 1985.... The record also indicates that on July 31, 1985 John Deere authorized [the debtor] to take an immediate credit on its account with John Deere. This is additional evidence of John Deere's acceptance of the agreement by performance ... the language of the relevant provisions of the Uniform Commercial Code and their underlying purpose compel the conclusion that John Deere gave value on July 31, 1985 and accepted the loan and security agreement at least by August 7, 1985. Thus the "value" and "agreement" elements necessary for attachment were satisfied by August 7, 1985.

*Id.* at 345–46.

In *International Harvester Credit Corporation v. Pefley,* 458 N.E.2d 257 (Ind. App.2d Dist.1983), the Indiana appellate court addressed the issue of the secured lender's signature on a security agreement. In that case, the secured lender signed the security agreement, which contained blanks for the secured lender's signature, eleven days after the debtor signed the agreement. Before the lender signed the agreement, the debtor sold the tractor that was the subject of the security interest without the consent of the lender. The lender sued the purchaser for conversion. The purchaser argued that it was not liable for conversion because the security interest had not attached when the tractor

was sold because the secured party had not signed the agreement. The court disagreed—

> It must be remembered that the dispute regards attachment of a security interest and is governed by the UCC. We are not considering date of execution of a contract per se. The UCC itself provides that it is to be liberally construed and applied to promote its underlying purposes and policies. *See* § 1–102. The courts may not create exceptions or add requirements to the clear dictates of the Code other than those specified. Therefore, we note that the content required of a security agreement is minimal in nature. An enforceable security interest must be created in a written agreement granting a security interest, the collateral must be described, and the debtor must sign the agreement. The Code does not require the date of the security agreement to appear therein, and a security agreement which contains neither the date nor the signature of the creditor is valid. If [the lender's agent] had never signed or dated the instrument, the outcome would not be affected. That he did sign and date the installment sales contract-security agreement on February 14th has no effect on the validity of the agreement or the date on which the security interest attached.

*Pefley,* 458 N.E.2d at 261.

The holding in *Vic Supply* is *obiter dicta* and the *NBD–Sandusky* and *International Harvester* cases were decided under Michigan and Indiana law, respectively, so none of the cases are controlling on this Court. The cases are compelling, however, especially in light of the express purpose of the UCC to "simplify, clarify and to permit the continued expansion of com-

mon practices" and the fact that "medieval, dogmatic insistence upon the precise performance of all formalities, with disastrous results attending the neglect of them, no longer holds dominant sway in the law of secured transactions. Pragmatism and realism have been brought to commercial law. It is a welcomed relief to those concerned with and dependent upon it". *In re Hargrove*, 2 U.C.C. Rep. Serv. 40 (Bankr.D.Conn.1964)(deciding issue of the lack of lender's signature on a financing statement). The question is whether the reasoning of the *Vic Supply*, NBD–Sandusky and *International Harvester* cases is valid under Pennsylvania law.

In Pennsylvania, as a matter of general contract law, an unsigned contract with a provision conditioning effectiveness on signature is "something less than a contract." *Franklin Interiors v. Wall of Fame Management Co., Inc.*, 510 Pa. 597, 511 A.2d 761, 762 (1986). In *Franklin* the creditor inserted language in its service contract requiring the creditor's signature before the contract became effective. The contract remained unsigned by the creditor. The Supreme Court of Pennsylvania would not allow the creditor to confess judgment on the contract because it was not effective due to the lack of signature. The Court left open the question, however, of whether the creditor could prevail on an assumpsit action.

■ Assumpsit actions are common law actions for breach of an implied promise. BLACK'S LAW DICTIONARY 122 (6th ed.1990). The basis of the action is the promise implied by law by the performance of the consideration. *Id.* In other words, the conduct of the parties can evidence intent to create a contract. This of course is black letter law—

> Parties rarely express a direct intention as to the moment when they conceive themselves to be bound by a

contract. The law attaches legal obligations, whether they will or not, when their acts fulfill the requirements of the law. If, therefore, the parties have agreed upon the terms that approved written contract shall contain, there is a contract, for they have made positive promise to one another, certain in their content and sufficient as consideration for another ... where the parties act under a preliminary agreement, they will be held to be bound, notwithstanding the fact the form contract has not been executed; and it seems that even where signing by both parties is originally contemplated, subsequent agreement manifested by acts may dispense with the requirement.

Samuel Williston, WILLISTON ON CONTRACTS § 278a (3d ed.1957); *see also* RESTATEMENT OF CONTRACTS § 26 (1932).

■ Pennsylvania law provides that a meeting of the minds can be found by conduct, course of dealing or performance. *Valhal Corp. v. Sullivan Associates, Inc.*, 44 F.3d 195, 201 (3d Cir.1995) *reh'g denied* 48 F.3d 760 (3d Cir.1995) (course of dealings between the parties demonstrated consent to a limitation of liability clause in an unsigned contract); *InfoComp, Inc. v. Electra Products, Inc.*, 109 F.3d 902, 905 (3d Cir.1997) (same); *see also In re Hance*, 181 B.R. 184, 185 (Bankr.M.D.Pa.1993) (acceptance by conduct sufficient to demonstrate intent); and *Sullivan v. Allegheny Ford Truck Sales, Inc.*, 283 Pa.Super. 351, 423 A.2d 1292, 1295 (1980). Given the above, the Court concludes that the analysis of this situation under Pennsylvania law is consistent with the reasoning of the *Vic Supply*, NBD–Sandusky and *International Harvester* cases.

■ In this matter, it is clear that the three elements of attachment were met, i.e. an agreement to give security was made, the secured debtor signed the security agreement, and the agreement described the collateral. *Kendrick v. Headwaters Production Credit Ass'n,* 362 Pa.Super. 1, 523 A.2d 395, 397 (1987) *appeal denied* 515 Pa. 614, 530 A.2d 867 (1987) (security interest exists as soon as all requirements of section 9–203 have been satisfied). There was not an explicit agreement to postpone the date of attachment. The provision for Finova's signature was in place for Finova's benefit and it was clear that the secured debtor authorized Finova to fill in the blank at any time. The 07/97 Agreement and the PMG Security Agreement were not signed by Finova, but an agreement can be found by performance. The only indications of performance, however, are discussed in a footnote in Finova's motion.[4] These statements are not in evidence as undisputed facts, so Finova is not entitled to summary judgment.[5]

## C. *Summary Judgment on the Postpetition Transfer Count*

■ As stated above, in Count IV of the Complaint, the Trust seeks to recover certain payments made by the Debtors to Finova after the Petition Date, which were previously defined herein as the Postpetition Transfers. The Trust relies on Section 549 of the Bankruptcy Code, or in the alternative, Section 9–306(4) of the UCC [6] as its basis of recovery.

Section 549 of the Bankruptcy Code provides that a trustee may avoid a transfer of property of the estate that occurs after the petition date that is not authorized under the Bankruptcy Code or by the court. 11 U.S.C. § 549(a). Section 9–306(4) of the UCC provides that:

In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(a) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

(b) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(c) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account

---

**4.** In footnote 4 of its motion, Finova states, *inter alia,* "Proteva would hardly have signed loan agreements or UCC statements, arranged on-site inspections of the collateral or sent periodic reports to FINOVA if FINOVA has no rights in the collateral."

**5.** The analysis does not end here, however. As referenced above, there does not appear to have been a UCC–1 financing statement identifying Proteva as the debtor filed in Illinois, although one was filed in Wisconsin. With the facts presently before the Court, the perfection of Finova's security interest on collateral in Illinois is predicated on the last UCC–3 financing statement that amended the name of the debtor from Fountain to Proteva. The

Trust has raised facts appearing to indicate that Fountain and Proteva may be distinct entities. But, as noted above, the only evidence the Trust brings in is the Statement of Financial Affairs which indicates some checks being written to Proteva and other checks written to Fountain. The actual checks (front and back) were not brought in, affidavits not presented, nor were charters of incorporation produced. *See Ernest Freeman & Co. v. Robert G. Regan Co.,* 332 Ill.App. 637, 76 N.E.2d 514 (1st Dist.1947). The issue is material but the facts brought by the Trust do not make it genuine.

**6.** The applicable Pennsylvania version is 13 PA. CONS. STAT. 9306(d).

prior to the insolvency proceedings; and

(d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is

(i) subject to any right of set-off; and

(ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within 20 days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

Various orders were entered in the Chapter 11 Case approving sales of assets of the estates and providing *inter alia* for the payment of a portion of the proceeds of the sales to Finova on account of Finova's security interest. The Trust contends that the Postpetition Transfers are recoverable under section 549(a) of the Bankruptcy Code as the payments were not authorized by the Bankruptcy Code because Finova did not have a perfected unavoidable security interest in the collateral that generated the sales proceeds for the reasons set forth in the prior portion of this opinion. In the alternative, the Trust argues that the Postpetition Transfers are recoverable under Section 9–306(4) of the UCC because Finova has failed to provide evidence that the funds out of which the Postpetition Transfers came were made from identifiable, non-commingled cash proceeds.

Finova urges dismissal of Count IV of the Complaint because Section 9–306(4) of the UCC is inapplicable.[7] Finova argues that Section 9–306(3) is the appropriate statutory provision for the Trust to seek recovery of the Postpetition Transfers. Section 9–306(3) provides that:

The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 20 days after receipt of the proceeds by the debtor unless,

(a) a filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement has been filed and, if the proceeds are acquired with cash proceeds, the description of collateral in the financing statement indicates the types of property constituting the proceeds; or

(b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds;

(c) the original collateral was investment property and the proceeds are identifiable cash proceeds; or

(d) the security interest in the proceeds is perfected before the expiration of the 20 day period.

The Court agrees with the Trust that a decision with respect to Count IV is premature, given that under either section 549(a) of the Bankruptcy Code, UCC section 9–306(4) or UCC Section 9–306(3), Finova has to demonstrate that it has a

---

**7.** Finova makes no argument as to whether and how section 549(a) of the Bankruptcy Code applies.

valid perfected security interest in the underlying collateral as a matter of law and it has not done so at this point.

Finally, the Court finds that a decision on Count VI (the equitable subordination count) is also premature until it is determined whether Finova's security interest is valid.

## IV.

### *CONCLUSION*

For the reasons stated herein, the motion of Finova Capital Corporation to dismiss and/or for entry of summary judgment as to Counts I through IV and VI of the Complaint is denied.

### ORDER

For the reasons stated in its Memorandum Opinion entered on this date, the Court denies the motion of Finova Capital Corporation to dismiss and/or for entry of summary judgment as to Counts I through IV and VI of the Complaint. A status hearing on this adversary proceeding will be held on July 10, 2002 at 10:30 a.m.